

08/28/2007

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| NEIL EISNER, | § | Case No. 05-44474 |
| | § | |
| Debtor. | § | Chapter 13 |
| | § | |
| | § | |
| JANNA L. COUNTRYMAN, STANDING CHAPTER 13 TRUSTEE OF THE BANKRUPTCY ESTATE NEIL EISNER, | § | Adv. Proc. No. 06-4154 |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| ESTATE OF MARGARET K. EISNER, and ESTATE OF EUGENE A. EISNER, | § | |
| | § | |
| Defendants. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter is before the Court following the trial of the First Amended Complaint to Avoid Preference to the Estate of Margaret K. Eisner and the Estate of Eugene A. Eisner and Request for a Temporary Restraining Order and Injunction (Docket #23) (the "Amended Complaint") filed by Janna L. Countryman (the "Plaintiff"), as Chapter 13 Trustee, against the probate estates of Margaret K. Eisner and Eugene A. Eisner (collectively, the "Defendants"). In her Amended Complaint, the Plaintiff seeks, among other things, to set aside and recover and certain transfers from the Debtor to the Defendants pursuant to 11 U.S.C. §§ 547 and 550. The Court, having considered the Amended Complaint, the stipulations of the parties, and the evidence presented at trial, makes the following findings of fact and conclusions of law pursuant to Rule 52 of the

Federal Rules of Civil Procedure, as applied to this Adversary Proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.[1]

## I. FINDINGS OF FACT

### A. Relevant Procedural Background

1. Neil Eisner (the "Debtor") initiated the bankruptcy case associated with this adversary proceeding by filing a voluntary petition for relief under Chapter 13 of Title 11 of the United States Code (the "Bankruptcy Code") on August 22, 2005 (the "Petition Date"). The Debtor initiated this adversary proceeding by filing his Complaint to Avoid Preference to the Estate of Margaret K. Eisner and the Estate of Eugene A. Eisner (Docket #1) on May 17, 2006. The Court subsequently entered an Order (Docket #24) granting Janna L. Countryman's Motion to Join Chapter 13 Trustee as a Party Plaintiff (Docket #19).

2. The Plaintiff filed her Amended Complaint on August 4, 2006. In her Amended Complaint, the Plaintiff asserts, among other things, that certain pre-bankruptcy distributions from an escrow account to the probate estates of the Debtor's deceased parents (the "Transfers") may be avoided pursuant to §547 of the Bankruptcy Code. The Plaintiff seeks to avoid the Transfers and to recover at least the amounts that the Defendants have remaining in their bank accounts.

3. In their Answer to First Amended Complaint to Avoid Preference (Docket #36) (the "Answer"), the Defendants deny that any of the Debtor's funds were transferred to them or that any amount is recoverable from them pursuant to §547 of the Bankruptcy Code. The Defendants also raise several affirmative defenses. In particular, the

[1] To the extent any of the findings of fact are construed as conclusions of law, they are hereby adopted as such. Likewise, to the extent any of the following conclusions of law are construed as findings of fact, they are hereby adopted as such.

Defendants assert that: i) any transfer(s) were made in the ordinary course of business or financial affairs of the Debtor and the Defendants and made according to ordinary business terms pursuant to Bankruptcy Code §547(c)(2); and ii) that any transfer(s) were made for the benefit of the Debtor to the extent that after such transfer(s), the Defendants gave new value to or for the benefit of the Debtor pursuant to Bankruptcy Code §547(c)(4).

**B. General Factual Background**

4. The Debtor's mother, Margaret K. Eisner, died on September 25, 1993. The Debtor's father, Eugene A. Eisner died on February 27, 2001. Both of the Debtor's parents left substantial probate estates, known as the "Estate of Margaret K. Eisner" and the "Estate of Eugene A. Eisner" (together, the "Estates").

5. The Debtor and his sister, Elizabeth E. Wolfson ("Wolfson"), were each named Co-Personal Representative of the Estates. Each is also a 50% beneficiary of the Estates. After disputes arose between the Debtor and his sister, they selected Charles A. Redd ("Redd"), an attorney employed by Sonnenschein, Nath & Rosenthal, LLP in St. Louis, Missouri, as an independent third party to assist in winding up the Estates.

6. From 1996 to 1999, the Debtor borrowed approximately $450,000 from his parents. The Debtor and his wife executed promissory notes reflecting their obligations to the Debtor's parents at various times (collectively, the "Notes"). In their Joint Pretrial Order (Docket #58), the parties stipulated that these Notes created obligations to the Estates as follows:[2]

[2] With respect to the two $50,000 obligations to the Estate of Margaret K. Eisner described in the following chart, the parties stipulated that these funds "were taken down shortly after 11/11/99."

| Date | Original Principal | Obligee |
|---|---|---|
| 01/30/1996 | $140,000.00 | Eugene A. Eisner |
| 10/23/1996 | 75,000.00 | Eugene A. Eisner |
| 12/24/1996 | 35,000.00 | Eugene A. Eisner |
| 03/07/1997 | 50,000.00 | Eugene A. Eisner |
| **Total** | **$300,000.00** | |
| | | |
| 11/11/1999 | $75,000.00 | Estate of Margaret K. Eisner |
| 11/11/1999 | 50,000.00 | Estate of Margaret K. Eisner |
| 11/11/1999 | 50,000.00 | Estate of Margaret K. Eisner |
| **Total** | **$175,000** | |

7. The Debtor and his wife lived in Texas from 1986 until May 1998. While living in Texas, the Debtor and his wife, along with Eugene A. Eisner, purchased a home in St. Louis, Missouri. Eugene A. Eisner was named on the deed as co-owner.

8. The Debtor and his wife moved to Missouri in May 1998. Eugene A. Eisner lived with the Debtor and his family in the home they had purchased in St. Louis. On June 28, 2002, after the death of Eugene A. Eisner, the Debtor, his wife, and the Estate of Eugene A. Eisner sold the home. Wolfson, as Co-Personal Representative of the Estate of Eugene A. Eisner, demanded that the net sale proceeds ("Sale Proceeds") be placed in escrow.

9. Pursuant to an Escrow Agreement dated June 26, 2002, the Sale Proceeds would be held in escrow until the Co-Personal Representatives and the Debtor's wife agreed on their disposition. The Sales Proceeds, which totaled $687,235.38, were placed in an escrow account established pursuant to the Escrow Agreement's terms at the U.S. Title Guarantee Company in St. Louis, Missouri. U.S. Title Guarantee Company was the Escrow Agent.

10. The Escrow Agreement made the parties' agreement or a court order determining the distribution of the Sale Proceeds the condition precedent for the release

of the escrowed Sale Proceeds. The Escrow Agreement recited the parties' agreement that, upon the occurrence of a condition precedent, the Debtor and his wife would be entitled to the Sale Proceeds, if any, belonging to them in excess of their obligations to the Estate of Eugene A. Eisner. The Escrow Agreement provided that it would terminate upon the condition precedent's occurrence. The Escrow Agreement further provided that, upon such termination, the Escrow Agent was to distribute the Sale Proceeds and all interest earned thereon in accordance with the parties' written agreement or the court order resolving the distribution of the Sale Proceeds.

11. Redd calculated that the Debtor and his wife owed $376,226.91 to the Estate of Eugene A. Eisner and $241,805.47 to the Estate of Margaret K. Eisner as of March 15, 2005.

12. On May 18, 2005, Wolfson, the Debtor, and his wife executed an Agreement Regarding Disposition of Escrowed Funds (the "Distribution Agreement"). By this time, the amount of the escrowed Sale Proceeds had increased to $718,319.80 due to accrued interest. The Distribution Agreement provided that the Debtor and his wife owned 74.72% of the escrowed Sale Proceeds, which equated to $536,728.55. The Distribution Agreement further provided that, upon release, this amount would be distributed to the Estates to be applied against and reduce, on a dollar-for-dollar basis, the indebtedness of the Debtor and his wife to the Estates.

13. The Escrow Agent released the escrowed Sale Proceeds pursuant to the Distribution Agreement. Redd deposited the Sales Proceeds (including the 74.72% allotted to the Debtor and his wife) into accounts that he had established for the Estates at a branch of UMB Bank, N.A. in St. Louis, Missouri.

14. Upon their release from escrow, the Sale Proceeds were disbursed as follows on May 19, 2005: $242,648.43 was deposited into the Estate of Margaret K. Eisner's account, of which $181,306.90 (74.72%) was owned by the Debtor and his wife immediately prior to the deposit; and $475,671.37 was deposited into the Estate of Eugene A. Eisner's account, of which $355,421.64 (74.72%) was owned by the Debtor and his wife immediately prior to the deposit.

15. On May 27, 2005, the Estate of Margaret K. Eisner paid $612,890.00 from its account to the United States Internal Revenue Service ("IRS"). The Estate of Margaret K. Eisner paid an additional $26.14 from its account to the IRS on August 2, 2005. On August 22, 2005, the Estate of Margaret K. Eisner had approximately $73,973.08 remaining in its account.

16. On May 27, 2005, the Estate of Eugene A. Eisner paid $606,090.00 from its account to the IRS. The Estate of Eugene A. Eisner had approximately $32,421.10 remaining in its account on August 22, 2005. Thus, as of August 22, 2005, the total sum of $106,394.18 remained in the Estates.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

17. A proceeding to recover a preferential conveyance raises a core matter over which this Court has jurisdiction to enter a final order. *See* 28 U.S.C. §§157(b)(2)(F) and (O) and 28 U.S.C. §1334.

### B. Avoidance and Recovery of Preferential Transfers

18. Sections 547(b) and 550 of the Bankruptcy Code authorize the avoidance and recovery of a transfer of "an interest of the debtor in property" *if* five conditions are

satisfied and *unless* one of seven exceptions defined in §547(c) is applicable. The five characteristics of an avoidable transfer are that it (1) benefit a creditor; (2) be on account of antecedent debt; (3) be made while the debtor was insolvent; (4) be made within 90 days before bankruptcy (or one year if the creditor was an insider at the time of the transfer); and (5) enable the creditor to receive a larger share of the estate than if the transfer had not been made. Section 547(g) expressly states that the debtor has the burden of proving the remaining elements of a preferential transfer under subsection (b), and the creditor or party in interest against whom recovery is sought has the burden of proving the non-avoidability of a transfer under subsection (c).

19. In this case, the parties stipulated in their Joint Pre-Trial Order that the Debtor was insolvent at the time of the Transfers. *See* 11 U.S.C. §547(b)(3). The parties also stipulated in their Joint Pre-Trial Order that the Transfers allowed the Defendants to be paid more than they would have received if this were a case under Chapter 7 of the Bankruptcy Code, the Transfers had not taken place, and the Defendants received payment to the extent provided by the Bankruptcy Code. *See* 11 U.S.C. §547(b)(5). The Court, therefore, turns to the remaining elements of §547(b) of the Bankruptcy Code.

*1. Transfer of an Interest of the Debtor in Property*

20. For a transfer to be avoided as preferential under §547(b) of the Bankruptcy Code, "it is essential that the debtor have an interest in the property transferred so that the estate is thereby diminished." *Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1356 (5th Cir. 1986) (quoting *Genova v. Rivera Funeral Home ( In re Castillo),* 39 Bankr. 45, 46 (Bankr.D.Colo.1984)). The Supreme Court has described the test under §547 as follows:

> The Bankruptcy Code does not define "property of the debtor." Because the purpose of the avoidance provision is to preserve the property includable within the bankruptcy estate - ***the property available for distribution to creditors*** - "property of the debtor" subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings.

*Begier v. I.R.S.*, 496 U.S. 53, 58 (1990) (emphasis added). The Fifth Circuit has repeatedly applied the *Beiger* standard in determining whether a transfer is avoidable under §547 of the Bankruptcy Code:

> The primary consideration in determining if funds are property of the debtor's estate is whether the payment of those funds diminished the resources from which the debtor's creditors could have sought payment. Conversely, if funds cannot be used to pay the debtor's creditors, then they generally are not deemed an asset of the debtor's estate for preference purposes. A common example is when a debtor holds funds in trust for another.

*In re Maple Mtg., Inc.*, 81 F.3d 592 (5th Cir. 1996); *see also, e.g., In re Southmark Corp.*, 49 F.3d 1111, 1117 (5th Cir. 1995).

21. Here, the parties dispute whether the transfer of the funds from escrow, pursuant to the Distribution Agreement, constituted a transfer of the Debtor's interest in property. The Plaintiff argues that the Debtor's contingent interest in the Sales Proceeds vested and became a present, ownership interest prior to the transfers to the Estates. The Defendants contend that the Transfers were not transfers of the Debtor's interest in property because 1) the Escrow and Distribution Agreements divested the Debtor of any interest in the Sale Proceeds, 2) the Debtor and his wife owned their portion of the Sale Proceeds in a tenancy by the entirety, and tenancy by the entirety property is excluded from a debtor's bankruptcy estate, and 3) the Sale Proceeds were being held in trust for the IRS.

(i) The Escrow and the Distribution Agreements did not divest the Debtor of his interest in the Sale Proceeds.

22. First, the Defendants assert that all of the Debtor's interest in the Sale Proceeds was permanently divested when the proceeds were placed in escrow. The Defendants point out that various courts have recognized that a depositor relinquishes control over the property when the property is placed into escrow and that the equitable interest in the property passes to the grantee under the escrow agreement. *See, e.g., Wilson v. United Savings of Texas (In the Matter of Missionary Baptist Foundation of America, Inc.)*, 792 F.2d 502, 504 (5th Cir. 1986) (applying Texas law); *Carlson v. Farmer's Home Administration (In re Newcomb)*, 744 F.2d 621, 626-27 (8th Cir. 1984) (applying Missouri law). In this case, however, the Debtor was not only a depositor – the Debtor was also a grantee.

23. The Escrow Agreement provided the Debtor and his wife with the right to determine, subject to Wolfson's agreement, the identity of the escrow's grantees and how much the grantees would receive. The subsequent Distribution Agreement reflects the parties' agreement that the Debtor and his wife would be grantees of 74.72% of the escrowed Sale Proceeds. Further, pursuant to the Distribution Agreement, the Debtor and his wife instructed that their 74.72% of the Sale Proceeds be disbursed to the Defendants as payment on the Notes. Under these circumstances, the Debtor and his wife had an equitable interest in 74.72% of the escrowed Sale Proceeds which was transferred to the Defendants on May 19, 2005 pursuant to an agreement with Wolfson.

(ii) The transferred funds are not excluded from the Debtor's bankruptcy estate because they were held as community property under Texas law.

24. Next, the Defendants argue that the Debtor and his wife held their share of

the Sale Proceeds in a tenancy by the entirety under Missouri law.[3] The Defendants assert that tenancy by the entirety property is exempt from property of the estate pursuant to §522(b)(2)(B) of the Bankruptcy Code. Therefore, the Defendants argue, the Transfers cannot be recovered as preferential pursuant to §547.

25. The Plaintiff asserts that Texas law applies. Texas does not recognize tenancies by the entirety. *See* TEX. PROB. CODE ANN. §§46(a) and 451 (Vernon Supp. 2007); *see also* 1 TEX. PRAC. GUIDE WILLS TRUSTS AND EST. PLAN. §1:49 (2006 Supp.) ("Texas does not have tenancy by the entirety[.]"). Rather, under Texas law, there is a presumption that any property acquired by a husband and wife is held as community property. *See* TEX. FAM. CODE ANN. §§3.002 and 3.003(a) (Vernon 2007).

26. The Bankruptcy Code does not determine the existence or scope of a debtor's interest in a given asset. These threshold issues must be resolved by reference to state law. *See, e.g., In re Farmers Markets, Inc.*, 792 F.2d 1400, 1402 (9th Cir. 1986); *Esselen Associates, Inc. v. Crysen/Montenay Energy Co.*, 102 B.R. 25, 28 (S.D. N.Y. 1989). As the Supreme Court has explained, "[p]roperty interests are created and defined by state law," and "there is no reason why such interests should be analyzed differently

---

[3] Under Missouri law, a conveyance to a husband and wife as joint grantees ordinarily creates a tenancy by the entirety. *See, e.g., Nelson v. Hotchkiss*, 601 S.W.2d 14, 17 (Mo. 1980) (en banc). A tenancy by the entirety has been explained as follows:

> [t]enancy by the entirety is a form of ownership in property created by marriage in which each spouse owns the entire property rather than a share or divisible part, and thus at the death of one spouse, the surviving spouse continues to hold title to the property…. Tenancy by the entirety is distinguishable from joint tenancy by one singular characteristic. The tenancy cannot be destroyed involuntarily by an individual creditor. And one spouse cannot destroy the entirety without the express consent of the other spouse.

*In re Brown*, 234 B.R. 907, 912-13 (Bankr. W.D. Mo. 1999). Proceeds from the sale of tenancy by the entirety property are also held in a tenancy by the entirety. *See id*. at 913; *In re Meyer*, 187 B.R. 650, 652 (Bankr. W.D. Mo. 1995); *Schwind v. O'Halloran*, 142 S.W.2d 55, 59 (Mo. 1940).

simply because an interested party is involved in a bankruptcy proceeding." *See Butner v. United States*, 440 U.S. 48, 55 (1979).

27. Generally, real property purchased in a common law state with funds earned in a community state will be characterized as community property. *See* RESTATEMENT (SECOND) OF CONFLICTS OF LAWS §259. Community property does not lose its community character merely by being invested in real property located outside of Texas, even if the community property is invested in real property located in a state that is not a community property state. *See, e.g., Sillero v. Sillero*, 2005 WL 1529422 at 2 (Tex. App. – Houston [14th Dist.] 2005). Conversely, real property purchased in a community property state such as Texas with funds earned in a common law state will be characterized as separate real estate, because the out-of-state earnings are characterized as separate property. *See, e.g., Orr v. Pope*, 400 S.W. 2d 614 (Tex. Civ. App. – Amarillo, 1966, no writ).

28. In this case, the Debtor and his wife were living in Texas when they purchased a home in Missouri. The assets used to purchase the home in Missouri were, presumptively, community property under Texas law. *See* TEX. FAM. CODE ANN. §§ 3.002 and 3.003(b) (Vernon 2007).[4] Accordingly, the Court concludes that the Missouri home and the proceeds from its sale were the community property of the Debtor and his wife. *See Welch v. Brown*, 96 S.W.2d 672, 674 (Tex.Civ.App. – Austin 1936, reh'g denied) (holding that the sale proceeds of certain community property were also

---

[4] Even if Missouri law applied and the Sale Proceeds were held in a tenancy by the entirety, the Debtor's interest in the Sale Proceeds would not be entirely insulated from avoidance. "It is universally accepted among all courts that a debtor's interest in entireties property becomes property of his bankruptcy estate." *In re Raynard*, 327 B.R. 623, 635 (Bankr. W.D. Mich. 2005) (collecting authority). Thus, in this case, the Debtor's one-half interest in the portion of the Sales Proceeds allotted to the Debtor and his wife would have become property of the estate but for the Transfers to the Estates. *See, e.g., In re Meyer*, 187 B.R. 650, 652-53 (Bankr. W.D. Mo. 1995).

community property subject to community debts).

29. The Court, therefore, concludes that, prior to the Petition Date, the Debtor and his wife had a community property interest in their allotted portion of the Sale Proceeds within the meaning of §§ 541 and 547 of the Bankruptcy Code. Their interest in the Sales Proceeds would have become property of the Debtor's bankruptcy estate but for the Transfers to the Defendants. *See* 11 U.S.C. §541(a)(2)(A); TEX. FAM. CODE ANN. §3.102(c) (Vernon 2007). Whether these Transfers were "preferential" within the meaning of §547 of the Bankruptcy Code is the subject of the Amended Complaint.

(iii) The Sale Proceeds were not being held in trust for the IRS.

30. Finally, the Defendants argue that the escrowed sales proceeds were being held in trust for the IRS and would not have become property of the Debtor's estate. However, the deposit of the funds in an account for the benefit of the Debtor, among others, demonstrates an interest in the funds for preference purposes. The Defendants, therefore, bear the burden of establishing that equitable title in the escrowed funds was held by the IRS or the Estates. *See Jenkins v. Chase Home Mortgage Corp. (In re Maple Mortgage, Inc.)*, 81 F.3d 592, 595-96 (5th Cir. 1996); *see also AFD Fund v. Transmed Foods, Inc. (In re Ameriserve Food Distribution, Inc.)*, 315 B.R. 24, 29 (Bankr. D. Del. 2004).

31. Neither the Escrow Agreement nor the Distribution Agreement support the Defendant's theory. The Escrow Agreement does not contemplate that the escrowed funds will be held in trust for the IRS or the Estates. Paragraph 15 of the Escrow Agreement provides:

> The Eisners and Wolfson each agree to provide the Escrow Agent with a certified tax identification number by signing and returning a W-9 (or

    > Form W-8, in the case of non-U.S. persons) to the Escrow Agent within thirty (30) days from the date hereof. The parties hereto understand that, in the event that either party's tax identification number is not certified to the Escrow Agent, the Internal Revenue Code may require withholding a portion of any interest or other income earned on the investment of the Funds, in accordance with the Internal Revenue Code, as amended, from time to time.

32. The Distribution Agreement does not mention the IRS or any other taxing authority. The parties to the Distribution Agreement agreed that the Debtor and his wife owned 74.72% of the escrowed Sale Proceeds and directed the Escrow Agent to release the proceeds. Upon the execution of the Distribution Agreement, the funds were released from escrow and transferred to the Defendants as set forth in the Distribution Agreement. The imposition of a tax lien on the Sale Proceeds after the Transfers to the Defendants is irrelevant to the status of the Sales Proceeds prior to the Transfers.

*2. Section 547(b)(1): Transfer to or for the Benefit of a Creditor*

33. The Debtor and his wife owed the Estate of Eugene A. Eisner $376,226.91 approximately two months before the date of the Transfers. The Debtor and his wife owed the Estate of Margaret K. Eisner $241,805.47 approximately two months before the date of the Transfers. The Estates received payments on these debts totaling $536,728.55 as a result of the Transfers. The Court, therefore, concludes that the Transfers were made to and for the benefit of the Defendants as creditors of the Debtor.

*3. Section 547(b)(2): Transfer On Account of An Antecedent Debt*

34. "A debt is antecedent if it is incurred *before* the transfer." *Southmark Corp. v. Schulte Roth & Zabel (In re Southmark Corp.)*, 88 F.3d 311, 316 (5th Cir. 1996) (emphasis in original). The Debtor and his wife incurred all of their debts to the Estates

at least five years prior to the Transfers. Therefore, the Court concludes that the Transfers were on account of antecedent debts owed to the Defendants.

*4. Section 547(b)(4): Made During the Avoidance Period*

35. Bankruptcy Code §547(b)(4)(A) limits avoidable transfers to transfers that occurred "on or within 90 days of the date of the filing of the petition[.]" 11 U.S.C. §547(b)(4)(A). Section 547(b)(4)(B) extends this avoidance period to one year "before the date of the filing of the petition, if such creditor at the time of the transfer was an insider[.]" In cases involving individual debtors, the term "insider" is defined as follows:

> (i) [a] relative of the debtor or of a general partner of the debtor;
> (ii) [a] partnership in which the debtor is a general partner;
> (iii) [a] general partner of the debtor; or
> (iv) [a] corporation of which the debtor is a director, officer, or person in control[.]

11 U.S.C. §101(31)(A).

36. Here, the Transfers were made outside of the 90-day avoidance period set forth in §547(b)(4)(A). The Plaintiff, however, alleges that the Defendants are insiders subject to the extended avoidance period. The Defendants deny this allegation. At trial, the Defendants' counsel cited *In re Sticka v. Anderson (In re Anderson)*, 165 B.R. 482 (Bankr. D. Or. 1994), to support their argument that they are not insiders.

37. Insiders specifically listed in the Bankruptcy Code are insiders *per se*. *See Browning Interests v. Allison (In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992). Whether a preference defendant who is not specifically listed as an insider in §101(31) of the Bankruptcy Code is, in reality, an insider is determined on a case-by-case basis. *Lynn v. Continental Bank, N.A. (In re Murchison)*, 154 B.R. 909, 911 (Bankr. N.D. Tex. 1993)

(citing *Wilson v. Huffman (Matter of Missionary Baptist Foundation of America, Inc.)*, 712 F.2d 206, 210 (5th Cir. 1983)).

38. "The cases which have considered whether insider status exists generally have focused on two factors in making that determination: (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length." *In re Holloway*, 955 F.2d at 1011 (citing S.Rep. No. 95-989, 95th Cong. 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Admin. News 5787, 5810). Courts also have considered the similarities between the relationship where a party is not a *per se* insider and the relationships enumerated in the statutory definition of "insider." *See In re Gilbert*, 104 B.R. 206, 209-210 (Bankr. W.D. Mo. 1989).

39. For example, in *Anderson*, the Chapter 7 trustee sued the debtor's brother, Ronald Anderson ("Ronald"), in Ronald's capacity as personal representative of their mother's probate estate, to recover a preferential transfer. The challenged transfer took place more than 90-days prior to bankruptcy. The trustee proceeded on the theory that the probate estate was an insider of the debtor and, therefore, the one-year look-back period applied to the avoidance action.

40. The issue before the bankruptcy court in *Anderson* was whether the probate estate was an insider. The bankruptcy court concluded that the probate estate did not fall within any of the insiders specifically mentioned in the Bankruptcy Code and, therefore, was not an insider *per se*. *In re Anderson*, 165 B.R. at 486. The bankruptcy court then analyzed whether the probate estate was an "entity with a sufficiently close relationship with the debtor that transactions between them should be subject to closer

scrutiny." *Id*. The bankruptcy court focused on the same two factors that the Fifth Circuit enunciated in *Holloway* to determine if such a relationship existed, ultimately concluding that the probate estate was not an insider. *Id*.

41. However, there is a key distinction between the facts in *Anderson* and the facts involved in this adversary proceeding. In *Anderson*, the Debtor was no longer a co-personal representative of the probate estate at the time of the relevant transfer. Here, the Debtor was a Co-Personal Representative of the Estates at the time of the Transfers. His relationship is not only analogous to a corporate officer or director, it is even closer -- the Debtor exercises 50% control over and holds a 50% interest in the Defendants *Cf.* 11 U.S.C. §101(2) and (31)(a)(iv).

42. For these reasons, the Court concludes that there exists a sufficiently close relationship between the Defendants and the Debtor such that the Defendants' conduct is subject to closer scrutiny than the conduct of those dealing with the Debtor at arm's length. The Defendants are "insiders" of the Debtor within the meaning of §101(31) of the Bankruptcy Code. Thus, the Court concludes that the Transfers fall within the one-year avoidance period set forth in §547(b)(4)(B) of the Bankruptcy Code.

**C. Section 547(c)(2) and (c)(4)**

43. The Defendants did not address these affirmative defenses in their briefing, in the Joint Pre-Trial Order, or at trial. They also did not offer any evidence regarding these affirmative defenses at trial. The Defendants have, therefore, failed to establish any affirmative defense to the Trustee's avoidance action.

**III. CONCLUSION**

For the foregoing reasons, the Court finds and concludes that the Plaintiff has

established that the Transfers to the Defendants were preferential and that she is entitled to recovery of the amounts remaining in the Estates. The Defendants failed to carry their burden of proving any affirmative defenses to the Plaintiff's cause of action. Accordingly, a separate judgment in the Plaintiff's favor will be entered consistent with these findings of fact and conclusions of law.

Signed on 8/28/2007

Brenda T. Rhoades MD

HONORABLE BRENDA T. RHOADES,
UNITED STATES BANKRUPTCY JUDGE